UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF AN APPLE IPHONE WITHIN A BLACK CASE, BELONGING TO RAYMOND NEUBERGER, THAT IS IN THE CUSTODY OF THE FAIRFIELD POLICE DEPARTMENT | Case No. __3:25-mj-532 RMS__<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Matthew Loucks, a Special Agent of the Federal Bureau of Investigation ("FBI"), New Haven Division, having been duly sworn, state as follows:

### I. INTRODUCTION

1.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18 of the United Sates Code. I have been employed as a Special Agent with the FBI since March 2020. I am a graduate of the FBI Training Academy in Quantico, Virginia, where I received training in diverse criminal matters, interviewing, interrogation, evidence collection, intelligence analysis, and legal matters, among other topics.  Prior to my employment as a Special Agent for the FBI, I spent five years employed as an Intelligence Analyst for the FBI, and four years employed as a Contractor Analyst for the Department of Treasury, Financial Crimes Enforcement Network ("FinCEN").

2.      I am currently assigned to the FBI New Haven Violent Crimes Squad, which is comprised of special agents from the FBI, with troopers from the Connecticut State Police, and with detectives and officers of various area police departments. In my current role, my particular emphasis is the investigation of matters including, but not limited to, robberies (including bank

robberies and Hobbs Act robberies), carjackings, firearm violations, mass killings, fugitives, kidnappings, assaults on federal officers, and murders-for-hire. Prior to my current role on the Violent Crimes Squad, I was assigned to the FBI Bridgeport Safe Streets Task Force ("BSSTF"). The BSSTF is comprised of special agents from the FBI and the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), with troopers from the Connecticut State Police, and with detectives and officers of various area police departments, including the Bridgeport Police Department, Norwalk Police Department, and Trumbull Police Department. The focus of the investigative efforts of the BSSTF is crime related to violence, guns, and drugs, often perpetrated by organized groups or gangs.

3.      During the course of my career as a FBI Special Agent, FBI Intelligence Analyst, and FinCEN Intelligence Analyst, I have participated in investigations of diverse crimes, including investigations into suspected homicides, kidnappings, narcotics trafficking, violent criminal activity, racketeering, and money laundering. My participation in these investigations has included assisting in the controlled purchase of narcotics utilizing confidential sources; writing and executing search and arrest warrants; providing testimony in federal grand jury and state court proceedings; analyzing records related to narcotics trafficking, violent criminal activity, and money laundering or other violations of the Bank Secrecy Act; reviewing and analyzing cellular records and cell site location information; and reviewing and analyzing social media records and information. I have participated in investigations into national and transnational organized criminal enterprises, including violent street gangs and large-scale narcotics trafficking organizations. I have attended gang and narcotics trainings sponsored by federal law enforcement. Finally, I have participated in investigations involving the use of court-authorized interception of wire and electronic communications.

4.      Further, I am a "federal law enforcement officer" within the meaning of the Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent authorized to enforce criminal laws as duly authorized by the Attorney General to request a search warrant.

## II. PURPOSE OF AFFIDAVIT

5.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – an electronic device described in Attachment A – that is currently in law enforcement possession, and the extraction from that property of electronically stored information, described in Attachment B.

6.      I am the case agent that has participated in the investigation that is the subject of this Affidavit, in conjunction with members of the Fairfield Police Department in Fairfield, CT. As a result of my participation in this investigation and information received from other law enforcement officers, I am familiar with the circumstances of the investigation and the information set forth in this affidavit. This affidavit is intended to show that there is sufficient probable cause for the requested search warrant and does not set forth all my knowledge about or investigation into this matter. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses.

7.      Based on the facts set forth in this affidavit, I believe **NEUBERGER** is the owner and user of the Apple iPhone located within a black cellphone case currently in the custody of the Fairfield Police Department, hereinafter referred to as the **TARGET DEVICE**. For the reasons detailed below, there is probable cause to believe that **NEUBERGER** used the **TARGET DEVICE** in furtherance of violations of Title 18, United States Code, Section 875(c), Interstate Communications of Threats, and Title 18, United States Code, Section 115, Threats to Federal Officers (collectively the "Subject Offenses"). Additionally, there is probable cause to

believe that the content on the **TARGET DEVICE** will contain evidence of the Subject

Offenses.

8.      The applied-for warrant would authorize the forensic examination of the

**TARGET DEVICE**, described in Attachment A, for the purpose of identifying electronically

stored data as particularly described in Attachment B.

### III. JURISDICTION

9.      The Court has jurisdiction to issue the proposed warrant because it is a "court of

competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court

of the United States that has jurisdiction over the offense being investigated. See 18 U.S.C. §

2711(3)(A)(i).

### IV. BACKGROUND

10.      **NEUBERGER**, date of birth XX/XX/1984, resides at 61 Wintergreen Drive,

Easton, Connecticut. **NEUBERGER** is a convicted felon with a criminal history that includes

the following:

11.      On April 25, 2025, the Fairfield Police Department arrested **NEUBERGER** and

charged him with one count of C.G.S. 53a-62 (Threatening 2nd) after an investigation revealed

**NEUBERGER** allegedly sent threatening communications directed at the Fairfield Police

Department. That case is pending as of the date of this warrant.

12.      On May 2, 2025, the Federal Bureau of Investigation arrested **NEUBERGER** and

charged him with one count of Title 18, United States Code, Section 875(c), Interstate

Communications of Threats. That case is pending as of the date of this warrant.

13.      On March 6, 2023, the Fairfield Police Department arrested **NEUBERGER** and

charged him with one count of Threatening 2 and one count of Harassment 2, after an

investigation revealed **NEUBERGER** allegedly sent threatening text messages to a Fairfield Police Detective. That case is pending as of the date of this warrant.

14.    On February 6, 2023, the Fairfield Police Department arrested **NEUBERGER** and charged him with malicious wounding/killing of an animal for which he was found guilty on December 7, 2023. **NEUBERGER** was sentenced to three years imprisonment with three years suspended, and four years of probation.

15.    On October 4, 2024, the Fairfield Police Department arrested **NEUBERGER** and charged him with malicious wounding/killing of an animal in the first degree for which he was found guilty on December 7, 2023. **NEUBERGER** was sentenced to three years imprisonment with 17 months suspended, and four years of probation.

16.    On October 28, 2022, **NEUBERGER** was arrested by the Pocono Township Police Department, located in Tannersville, Pennsylvania, and charged with one count of Driving Under the Influence of Alcohol or Controlled Substances, and an unspecified violation of the Pennsylvania Vehicle Code Title 75. No disposition for the matter was provided.

## V. STATEMENT OF PROBABLE CAUSE

### *Threats Toward the Fairfield Police Department*

17.    At approximately 8:00 p.m. on April 24, 2025, a Fairfield Police Department Officer (K.W.) was operating their marked patrol vehicle at the intersection of Reef Road and Post Road (Fairfield, Connecticut) when K.W. observed who they recognized to be **NEUBERGER** operating a white Jeep Grand Cherokee, bearing Connecticut registration BK07766). **NEUBERGER** stopped his vehicle in the middle of Post Road and began screaming, "fuck you, fuck you," repeatedly at K.W. while giving K.W. the middle finger. **NEUBERGER** then departed the area at which time K.W. decided not to follow **NEUBERGER**. Shortly

thereafter, K.W. observed **NEUBERGER's** vehicle again pulling out of a sideroad directly across the street from the Fairfield Police Headquarters. At this time, **NEUBERGER** continued to yell profanities at K.W. while gesturing his middle finger toward the Officer.

18.    Thereafter, K.W. spoke with another Fairfield Police Officer (A.K.) who advised K.W. that while A.K. was in the rear police/fire department parking lot, he (A.K.) observed **NEUBERGER** on Nichols Street. A.W. stated he observed **NEUBERGER** in his vehicle, stopped at the rear entrance to the police parking lot, staring at A.W. for a period before **NEUBERGER** drove off.

19.    After these incidents, **NEUBERGER** proceeded to call the Fairfield County Regional Dispatch Center. During the calls, **NEUBERGER** displayed aggressive and paranoid behavior and made allegations that the Fairfield Police and federal law enforcement officers were following and watching him. **NEUBERGER** alleged that his perceived harassment by law enforcement resulted in the hospitalization of his mother. **NEUBERGER** stated to the dispatcher, in substance, "If they don't stop, there's going to be a big fucking problem here in Fairfield." **NEUBERGER** later stated, in substance, "if God forbid something happens to her (referring to **NEUBERGER's** mother) or my father… I don't care who did it … Fairfield Police did it, and I'm coming."

20.    During the call with the dispatcher, **NEUBERGER** also stated that the Fairfield Police had his cellphones in evidence, and stated he could not retrieve them from the Fairfield Police Headquarters because someone at the Fairfield PD had a protective order against him. When asked by the dispatcher which Fairfield Police Officer had the protective order, **NEUBERGER** stated, "douchebag… Mike… Zerella" and "the asshole McKeon."

21.     The dispatcher subsequently transferred **NEUBERGER** to speak with the Patrol

Shift Commander, Lieutenant E.K. During the call, **NEUBERGER** continued to claim he was

being followed by the Fairfield Police, Bridgeport Police, and federal law enforcement and

demanded the perceived surveillance stop. **NEUBERGER** stated he had an ALCU attorney.

**NEUBERGER** stated, if the "ACLU doesn't do it, I'm going to do it." **NEUBERGER**

continued to reiterate that his mother had a heart attack and attempted to commit suicide twice

due to the alleged police harassment. **NEUBERGER** warned E.K., "if something happens to her

or my father… I don't care who did it… Fairfield Police did it and I'm coming for ya. You better

fuckin' stop this shit now." **NEUBERGER** then advised E.K., "You better tell that cocksucker

[Detective] McKeon, and you better tell that cocksucker [Detective] Zerella, if anything happens

to me, my folks, anything, I'm coming for them. Now you stop this shit right the fuck now. I

don't give a fuck about probation. I've been to high bond. I've been to prison. I don't care about

this shit. Anything happens, it's Fairfield PD. I don't care who did it. Fairfield PD did it. And

I'm coming." **NEUBERGER** went on to say, "You want me to level that police station? If

something happens to her (**NEUBERGER's** mother), I'm coming. When asked if

**NEUBERGER** needed help, **NEUBERGER** stated he did not need help, but advised E.K.,

"You're the one that needs the help. You might need National Guard."

22.     According to the Fairfield Police, around the same time **NEUBERGER** spoke

with the dispatcher and Lieutenant E.K. on April 24, 2025, **NEUBERGER** began to send text

messages to a member of the Fairfield Police Commission where **NEUBERGER** made

additional threats toward the Fairfield Police. The pertinent messages are as follows:

**Pertinent Message 1:**

Today 7:57 PM

Confirmed my mother had a heart attack

I'm going to kill all the Fairfield cops

Brutally

You need to calm down what you are saying will get you arrested again

Tell me you are just vetting

I am going to have to report this unless you tell me your just venting your frustrations to me

And are not going to harm anyone

**Pertinent Message 2:**

Tell Fairfield PD I'm close to snapping

Keep following me

**Pertinent Message 3:**

You know what these cocksyckers are doing

They think I threatened the shield

On duty, off duty... there's gonna be multiple 21 gun salutes if they don't knock it off

I'm not fucking around

Tell them to leave me the fuck alone

I'm armed

All they have to do is leave me alone

That's it

I'm not fucking with them

But I will if they keep it up

23.     Based on my training and my personal and professional experience, I recognized the above text messages were exchanged via iMessage, Apple's instant messaging service for Apple devices such as iPhones, iPads, and MacBook laptops. Based on my training and my personal and professional experience, and a review of materials including the Apple support website, I understand that iMessages travel over the internet between users of Apple devices. Furthermore, I understand iMessages go through and are supported directly by Apple's servers.

24.     Based on the circumstances, Detectives with the Fairfield Police Department applied for and received an arrest warrant for **NEUBERGER** charging him with violation of

C.G.S. 53a-62 (Threatening 2nd). In addition, Fairfield Police Detectives also applied for and

were issued two Search and Seizure Warrants for both **NEUBERGER's** person, as well as his

residence at 61 Wintergreen Drive, Easton, CT, to seize his cellular phone and weapons. All

three warrants were signed at the Connecticut Superior Court in Bridgeport on April 25, 2025.

  25. On April 25, 2025, at approximately 12:48 p.m., Fairfield Police Detectives took

**NEUBERGER** into custody leaving his residence in Easton, CT. Upon executing the Search and

Seizure Warrant on his residence, Fairfield Detectives seized **NEUBERGER's** Apple iPhone

within a black case which is currently secured at the Fairfield Police Department as Exhibit #1.

  26. On May 2, 2025, Fairfield Police Detectives applied for and received a Search

Warrant from the Connecticut Superior Court to search the content of NEUBERGER's cellphone

to uncover evidence that NEUBERGER was stalking law enforcement, including specific

Fairfield Police personnel, and whether NEUBERGER intended to cause harm to law

enforcement. On May 8, 2025, a Fairfield Police Detective notified your affiant that an initial

review of NEUBERGER's cellphone extraction revealed multiple pertinent and concerning

internet searches that NEUBERGER conducted on April 11, 2025, including, but not limited to,

the following:

  a) *"will zarella be a good cop from six feet under?*

  b) *"will mckeon be a good cop from six feet under?*

  c) *"whwere [sic] does keven mckeon douchebag detective Fairfield ct police live"*

  d) *"im gonna hang mckweon upside down first"*

e) *"not today, not tonorrow [sic], not next week, zarel has to be taken out im [sic] coming now…*

f) *"just leave me alone otherwise one of your agents if not multiple with zarella are going to d\*e"*

27.     Based on my training and experience, and my participation in this investigation, I believe that on April 11, 2025, nearly two weeks before NEUBERGER engaged in the above-described threatening behavior directed toward the Fairfield Police Department, he conducted multiple internet searches involving Fairfield Police Detectives Zerella and McKeon. Specifically, NEUBERGER conducted internet searches to locate the residence of Detective McKeon and searches indicative of his desire to kill Detectives Zerella and McKeon.

## *Threats and Intimidation of a FBI Special Agent*

28.     On the same evening as the incidents involving **NEUBERGER** and the Fairfield Police Department (April 24, 2025), **NEUBERGER** placed a handwritten note in the residential mailbox of a Special Agent of Federal Bureau of Investigation. The letter read, "BACK THE BUREAU OFF BEFORE ITS TOO LATE," and was signed "RAY NEUBERGER." A photograph of the letter is included below:



29.    At approximately 7:32 p.m. on April 25, 2025, **NEUBERGER** called the FBI New Haven Operations Center on his own accord and asked to speak to an FBI agent. Shortly thereafter, your affiant and other FBI agents placed a call to **NEUBERGER**. When Agents inquired as to the purpose of **NEUBERGER's** call to the FBI New Haven Operations Center, **NEUBERGER** stated he was in a "deep, dark cloud" with the FBI and believed he was the subject of a federal investigation, specifically by the FBI or the United States Marshals Service (USMS). **NEUBERGER** believed law enforcement surveilled him everywhere he went. **NEUBERGER** claimed that the FBI visited **NEUBERGER's** residence to question him regarding a social media post and **NEUBERGER's** relationship with an individual who allegedly possessed ghost guns.

30.    **NEUBERGER** then volunteered information to your affiant that on the evening of April 25, 2025, an FBI Special Agent, known to me, drove down **NEUBERGER's** street while **NEUBERGER** was outside walking his dog. **NEUBERGER** alleged that the FBI Special Agent stopped their vehicle at the top of the driveway of **NEUBERGER's** residence and

exchanged words with **NEUBERGER. NEUBERGER** identified the FBI Special Agent by
name and provided your affiant with the FBI Special Agent's home address. It should be noted,
the FBI Special Agent's residence is located only two-tenths of a mile away from
**NEUBERGER's** Easton, Connecticut, residence.

31.     **NEUBERGER** proceeded to volunteer information to your affiant that the night
before, on April 24, 2025, **NEUBERGER** placed a note inside the FBI Special Agent's mailbox
which he acknowledged read, "Back the Bureau off before it's too late."

32.     When your affiant asked why **NEUBERGER** targeted this specific FBI Special
Agent, **NEUBERGER** advised the FBI Special Agent spread rumors and made disparaging
statements about **NEUBERGER** to **NEUBERGER's** neighbors, friends, family, and the
Fairfield Police Chief.

33.     On April 26, 2025, your affiant learned that **NEUBERGER** approached the same
FBI Special Agent outside of the Agent's Easton residence. Thereafter, the FBI Special Agent
reported the incident to the Easton Police Department and provided a statement to the Easton
Police Department.

34.     Your affiant reviewed the FBI Special Agent's statement made to the Easton
Police Department on April 26, 2025. The statement alleged, in part, as follows:

35.     At approximately 3:24 p.m. on April 26, 2025, **NEUBERGER** walked toward the
FBI Special Agent's Easton residence, stopped at the front of the Agent's driveway, and
remained on the public street. **NEUBERGER** stated he wanted to apologize to the Agent for his
recent actions. During the conversation, **NEUBERGER** admitted to previous threatening
behavior directed at the FBI Special Agent as a result of the Agent's affiliation with the FBI.

36.     Specifically, **NEUBERGER** stated that shortly after his most recent release from incarceration[1], **NEUBERGER** became increasingly angry of the left-wing Democrats and liberals, as well as the FBI and former Director James Comey. **NEUBERGER** advised one night shortly after his release, he was intoxicated and angry with the FBI, and felt he needed to do something to teach the FBI a lesson. **NEUBERGER** recalled that his father told him about the FBI Special Agent who lived near **NEUBERGER'S** residence.  That night, **NEUBERGER** got a pizza and drove to the FBI Special Agent's Easton residence, parked in front of the Agent's residence, and proceeded to play loud music from his car to disturb and wake up the Agent, as it was late in the night. **NEUBERGER** remembered that someone from the Agent's house woke up and shined a bright flashlight at **NEUBERGER'S** vehicle.

37.     The FBI Special Agent advised **NEUBERGER** that he recalled that incident, and that he also recalled that when he shined the flashlight at **NEUBERGER'S** vehicle, **NEUBERGER'S** vehicle aggressively backed up and realigned the car towards the FBI Special Agent's residence. **NEUBERGER** then turned on the vehicle's high beams, illuminating the Agent's house, where it remained for a period before **NEUBERGER** drove away. The FBI Agent remembered being concerned at the time for the safety of his family.

38.     **NEUBERGER** allegedly advised the FBI Special Agent that he did this to get back at "the man" and the "FBI," and that doing that to this FBI Agent was his way of "getting back" at "them." **NEUBERGER** allegedly advised the FBI Special Agent that he had been thinking about that incident for almost one year.

---

[1] A review of COLLECT Connecticut Department of Corrections (CT DOC) Movement History records revealed **NEUBERGER** was most recently released from CT DOC custody on July 26, 2024.

As detailed above, Fairfield Police Detectives applied for and received a search warrant from the

Connecticut Superior Court to search the content of NEUBERGER's cellphone to uncover

evidence that NEUBERGER was stalking law enforcement, and to determine whether

NEUBERGER intended to cause harm to law enforcement. On May 8, 2025, a Fairfield Police

Detective notified your affiant that an initial review of NEUBERGER's cellphone extraction

revealed multiple pertinent and concerning internet searches that NEUBERGER conducted on

April 11, 2025, including searches for the name and Easton address of the aforementioned FBI

agent. Additionally, NEUBERGER searched, *"im going to k\*l a fed whose been harassing me*

*for 4 years."* Based on my training and experience, and my participation in this investigation, I

believe NEUBERGER conducted an internet search for the aforementioned FBI agent's name

and address nearly two weeks before NEUBERGER left a threatening letter in his mailbox.

Furthermore, I believe nearly two weeks before leaving the threatening letter in the FBI agent's

mailbox, NEUBERGER also conducted internet searches detailing his intent to kill (*k\*l*) a

federal agent (*fed*) who he perceived had been harassing him for several years. **VI.**

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

39.    Based on my knowledge, training, and experience, I know that electronic devices

can store information for long periods of time. Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device. This information can

sometimes be recovered with forensics tools.

40.    There is probable cause to believe that things that were once stored on the

**TARGET DEVICE** may still be stored there, for at least the following reasons:

41.    Based on my knowledge, training, and experience, I know that computer files or

remnants of such files can be recovered months or even years after they have been downloaded

onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

42.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

43.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

44.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

45.     Forensic Evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **TARGET DEVICE** was used, the purpose of its use, who used it, and when. There is

probable cause to believe that this forensic electronic evidence might be on the **TARGET DEVICE** because:

46.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

47.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

48.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

49.     The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is adynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.

Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

50.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

51.     I know that when an individual uses an electronic device during the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

52.     Nature of examination. Based on the foregoing, and consistent with Rule41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

53.     Manner of execution. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## VII.    CONCLUSION

54.    Based on the facts set forth in this affidavit, there is probable cause to believe, and I do believe, that evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Attachment B, are located within the **TARGET DEVICE**, as more fully described in Attachment A.

55.    Therefore, respectfully, I request that the Court issue the proposed search warrant for the property described in Attachment A, authorizing the seizure and search of the items in Attachment B.

Respectfully submitted,

MATTHEW
LOUCKS
Digitally signed by MATTHEW
LOUCKS
Date: 2025.05.30 13:50:08 -04'00'

MATTHEW DAVID LOUCKS
Special Agent
FBI

Attested to by the affiant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Microsoft Teams on May 30, 2025.

Robert M Spector
Digitally signed by Robert M
Spector
Date: 2025.05.30 14:22:20 -04'00'

HON. ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

The property to be searched is an Apple iPhone located within a black cellphone case belonging to RAYMOND **NEUBERGER**. The **TARGET DEVICE** was seized by the Fairfield Police Department from **NEUBERGER's** residence at 61 Wintergreen Drive, Easton, CT on April 25, 2025, pursuant to a Search and Seizure Warrant authorized by the Connecticut Superior Court on April 25, 2025. The **TARGET DEVICE** was secured at the Fairfield Police Department. The **TARGET DEVICE** is currently in the custody of the Fairfield Police Department in Fairfield, Connecticut.

This warrant authorizes the forensic examination of the **TARGET DEVICE** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

### Particular Things to be Seized

1. All records and information on the **TARGET DEVICE**, described in Attachment A, that related to violations of Title 18, United States Code, Section 875(c), Interstate Communications of Threats, and Title 18, United States Code, Section 115, Threats to Federal Officers (collectively the "Subject Offenses"), and involved RAYMOND **NEUBERGER** from July 26, 2024 through April 25, 2025, including:

   a) Location data, including WiFi networks login data, GPS data collected by the **TARGET DEVICE** logging location, and including Google maps, Apple maps, or any other third-party mapping program which logged the location of the **TARGET DEVICE** to be searched;

   b) Records and information regarding **NEUBERGER's** schedule, travel, and his planned location, activities, and events;

   c) All numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, video, and images stored in the memory of the **TARGET DEVICE**;

   d) Descriptions of times, dates, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the Subject Offenses;

   e) Any and all records, however created or stored, which tend to demonstrate ownership and use of the **TARGET DEVICE**, and identification bearing the name or

photograph of any person, contacts, address books, date books, calendars, personal files, and photographs or videos of persons contained in the **TARGET DEVICE;**

f)  If applicable, any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the **TARGET DEVICE**, such as passwords, sign on codes, and program design; GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

g)  If applicable, saved searches, locations, and route history in the memory of the **TARGET DEVICE**;

h)  Images and videos in the memory of the **TARGET DEVICE**;

i)  Evidence of user attribution showing who used or owned the **TARGET DEVICE** at the time the things described in this affidavit were created, edited, or deleted, such as logs, contacts, saved usernames and passwords, documents, and browsing history;

j)  Any conversations on applications downloaded onto the **TARGET DEVICE**, including social media and text message applications, including but not limited to Telegram, Facebook messenger, Snapchat, and other similar social media platforms;

k)  Records or information regarding possession, use, control, or the acquisition or attempted acquisition of, instrumentalities of the Subject Offenses;

l)  Records or information regarding victims or intended victims of the Subject Offenses, including any image or recording of them, their voice, their possessions, their

residence, or residences or locations frequented by or associated with them, and prior attempts or efforts to victimize them;

m) Records or information regarding how **NEUBERGER** chose victims of the Subject Offenses, research on his victims and any locations or individuals associated with them, including their movements, typical location, pattern of activity, employment, and any surveillance or attempted surveillance of his victims or intended victims, and all planning, preparation and actions by **NEUBERGER** to commit the Subject Offenses;

n) Records or information regarding what **NEUBERGER** did, intended to do, or considered doing, to the victims, and/or how he planned to dispose of any evidence of the Subject Offenses;

o) Records and information regarding communications or contacts, or attempted communications or contacts, regarding the Subject Offenses, including any and all communications between **NEUBERGER** and his victims, co-conspirators, associates or facilitators, and which are regarding, relating to, or are evidence of the Subject Offenses;

p) Records and information regarding concealing evidence of the Subject Offenses, or efforts or attempts to do so, the destruction, attempted destruction, or withholding of evidence, and attempts to identify, locate, contact, intimidate or threaten victims of, or potential witnesses to, the Subject Offenses;

q) Records and information regarding email accounts, phone numbers, online storage, online applications or apps, social media accounts and other online accounts used by

**NEUBERGER**, including usernames, aliases, pin codes, passwords and other means of accessing online accounts;

r) Records or information documenting the historical order of events and activity on the **TARGET DEVICE**;

s) Voicemails, emails, chats, texts, web searches, browser history, audio recordings, photographs, videos, calendar entries, writings, notes, blogs, vlogs, and social media activity relating to the Subject Offenses.

2. Evidence of user attribution showing who used or owned the **TARGET DEVICE** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3. Records evidencing the use of the Internet, including:

    a. Records of Internet Protocol addresses used; and,

    b. Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4. As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form. It is specifically authorized that stored electronic information, data, information and images contained in the above-described subject devices may be reproduced by printing said stored electronic information or

otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.

## Search Procedure

5. The examination of the Device may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **TARGET DEVICE** to human inspection in order to determine whether it is evidence described by the warrant.

6. The initial examination of the **TARGET DEVICE** will be performed within a reasonable amount of time not to exceed 120 days from the date of execution of the warrant. If the government needs additional time to conduct this review, it may seek an extension of the time period from the Court within the original 120-day period from the date of execution of the warrant. The government shall complete this review within 180 days of the date of execution of the warrant. If the government needs additional time to complete this review, it may seek an extension of the time period from the Court.

7. If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders on the **TARGET DEVICE** or image do not contain any data falling within the scope of the warrant, they will not search or examine those files or folders further without authorization from the Court. Law enforcement personnel may continue to examine files or data falling within the purview of the warrant, as well as data within the operating system, file system, software application, etc., relating to files or data that fall within the scope of the warrant, through the conclusion of the case.

8. If an examination is conducted, and it is determined that the **TARGET DEVICE** does not contain any data falling within the ambit of the warrant, the government will return the **TARGET DEVICE** to its owner within a reasonable period of time following the search and will seal any image of the **TARGET DEVICE**, absent further authorization from the Court.

9. If the **TARGET DEVICE** contains evidence, fruits, contraband, or is an instrumentality of a crime, the government may retain the **TARGET DEVICE** as evidence, fruits, contraband, or an instrumentality of a crime or to commence forfeiture proceedings against the **TARGET DEVICE** and/or the data contained therein.

10. The government will retain a forensic image of the **TARGET DEVICE** for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.